UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| JEROME A. MAHER, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 16-cv-1646 (KBJ) |
| Plaintiff, | | |
| v. | | |
| PENSION BENEFIT GUARANTY CORPORATION, | | |
| Defendant. | | |

## MEMORANDUM OPINION

On March 25, 2015, the Pension Benefit Guaranty Corporation ("PBGC") denied Plaintiff Jerome Maher's claim for benefits under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, in connection with a pension plan that was terminated in 1984. Maher filed this lawsuit to challenge the PBGC's denial (*see* Compl., ECF No. 1), and the parties have now filed cross-motions for summary judgment (*see* Mem. in Supp. of Def.'s Mot. for Summ. J. ("Def.'s Mem."), ECF No. 29-1; Mot. to Deny Def.'s Mot. for Summ. J. & Cross-Mot. for Summ. J. ("Pl.'s Mem."), ECF No. 31). As explained fully below, this Court concludes that the PBGC's decision was not arbitrary or capricious because substantial evidence supported the PBGC's finding that Maher received the benefits to which he was entitled in 1984 when the pension plan was terminated. Accordingly, this Court will **GRANT** the PBGC's motion for summary judgment and **DENY** Maher's cross-motion for summary judgment. A separate Order consistent with this Memorandum Opinion will follow.

I.  **BACKGROUND**

   A.  **The PBGC's Role In Terminating Pension Plans Under ERISA**

"The PBGC is a federal corporation charged with administering and enforcing the plan termination insurance provisions of ERISA." *Deppenbrook v. PBGC*, 778 F.3d 166, 168 (D.C. Cir. 2015) (internal quotation marks and citation omitted); *see* 29 U.S.C. § 1302 (describing the PBGC's powers and functions). Subject to various statutory limitations, the PBGC guarantees the payment of benefits under pension plans covered by ERISA. *See* 29 U.S.C. §§ 1321–22b. The PBGC also supervises the termination process for covered pension plans, including plans whose assets are sufficient to cover all benefit liabilities and whose termination therefore does not trigger the PBGC's insurance obligations. *See PBGC v. LTV Corp.*, 496 U.S. 633, 638–39 (1990); *see also* 29 U.S.C. § 1341(b). ERISA refers to these as "standard" terminations. 29 U.S.C. § 1341(b).[1]

A standard termination is initiated by a pension plan's administrator, who must give all plan beneficiaries notice of intent to terminate the plan at least 60 days before the proposed termination date. *See id.* § 1341(a)(2); *see also* 29 C.F.R. § 4041.23(a)(1).[2] The plan administrator must also notify each plan participant of the benefits to which he is entitled and the basis for calculating that amount. *See* 29 U.S.C.

---

[1] This opinion cites the statutory and regulatory provisions that apply to single-employer pension plans. *See, e.g.*, 29 U.S.C. § 1341. ERISA and its implementing regulations contain separate provisions for multi-employer plans that are not applicable in this case. *See, e.g.*, 29 U.S.C. § 1341a.

[2] Several of the statutory and regulatory provisions cited in this paragraph have been amended or renumbered since 1984 (the year that the pension plan at issue in this case was terminated). *See generally* 29 U.S.C. § 1341 (1982); 29 C.F.R. pts. 2616–17 (1984). All of the requirements that appear in this paragraph have remained substantively similar between 1984 and the present, and for convenience's sake, the Court cites the current versions of both ERISA and the PBGC regulations, except where otherwise noted.

§ 1341(b)(2)(B); 29 C.F.R. § 4041.24.  In addition to giving notice to all beneficiaries of a pension plan, the plan administrator must also file a standard termination notice with the PBGC, alerting the PBGC to the plan's assets and benefit liabilities.  *See* 29 U.S.C. § 1341(b)(2)(A); 29 C.F.R. § 4041.25(a).  Upon receiving this notice, the PBGC must review it and notify the plan administrator within 60 days if the PBGC believes that the plan's assets are not sufficient to cover all benefit liabilities.  *See* 29 U.S.C. § 1341(b)(2)(C)(i); 29 C.F.R. § 4041.31(a)(1)(iv).

Absent receiving such a notice from the PBGC, the plan administrator commences distributing the plan's assets to its beneficiaries in accordance with a priority order set forth in ERISA.  *See* 29 U.S.C. §§ 1341(b)(2)(D), 1344; 29 C.F.R. § 4041.28(a)(1), pt. 4044.  And once this distribution is complete, the plan administrator must certify in writing to the PBGC that the plan's assets "have been distributed . . . so as to pay all benefit liabilities under the plan."  29 U.S.C. § 1341(b)(3)(B); *see also* 29 C.F.R. § 4041.29.  In 1984, the year in which the pension plan at issue in this case was terminated, PBGC regulations also required that the plan administrator's post-distribution certification to the PBGC contain "[t]he amount of the benefit provided" to "each participant or beneficiary to whom distribution was made[.]"  29 C.F.R. § 2617.23(a)(1) (1984).

**B.    Factual Background**

Plaintiff Jerome Maher began working for First Federal Savings and Loan Association of Wilmette ("First Federal") in 1963.  (*See* Letter from Jerome A. Maher to Charles Korb, PBGC (Mar. 14, 2012), Admin. R. ("AR"), ECF Nos. 28-1 to 28-2,

3

106.)[3] *See also Maher v. United States* (*Maher IV*), 92 Fed. Cl. 413, 414 (2010). By 1982, Maher was First Federal's director and executive vice president. *See Maher IV*, 92 Fed. Cl. at 414. Maher was also a participant in the company's employee pension plan. *See id.* In 1982, at the behest of federal regulators, First Federal merged with several other savings and loan associations to form Horizon Federal Savings Bank ("Horizon"), and Maher stayed on as Horizon's executive vice president. *See id.* As part of the merger, Maher agreed to forfeit his existing First Federal pension plan with the understanding that Horizon would eventually create a comparable plan for him. *See id.*[4]

On May 15, 1984, Horizon notified the PBGC that it intended to terminate First Federal's pension plan over the course of the coming months. (*See* Form 5310, AR 10–14.) Maher personally signed the notice form as Horizon's executive vice president (*see id.*, AR 10), and an attachment to the form listed benefit amounts to be distributed to 25 individual beneficiaries, including $57,834 to Maher (*see* Form 6088, AR 15). Shortly before providing the requisite notice to the PBGC, Horizon had sent Maher a letter notifying him of his entitlements upon the termination of the plan and prompting him to elect whether to receive his benefits in monthly annuity payments of $1,784

---

[3] Page-number citations to the administrative record refer to the Bates numbers that appear at the bottom of each page. With respect to all other documents that the parties have filed, page-number citations refer to the page numbers that the court's electronic filing system automatically assigns.

[4] In several lawsuits across multiple courts, Maher and another former Horizon executive have sought to recover benefits under a deferred compensation plan that Horizon later established. *See Maher IV*, 92 Fed. Cl. 413; *Maher v. FDIC* (*Maher III*), 441 F.3d 522 (7th Cir. 2006); *Maher v. United States* (*Maher II*), 314 F.3d 600 (Fed. Cir. 2002); *Maher v. Harris Trust & Sav. Bank* (*Maher I*), 75 F.3d 1182 (7th Cir. 1996). The plan at issue in those lawsuits was established in 1985 and is different from the First Federal employee pension plan under which Maher seeks to recover in this case, and which terminated in 1984. (*See* Letter from Jerome A. Maher to William F. Condon Jr. (Aug. 21, 2014), AR 129 (explaining that Maher's claims regarding the two plans "are completely separate").)

4

beginning on his retirement date in 1999, or in a single lump-sum payment of $57,834 upon the plan's termination, in which case the distribution could be rolled over "tax-free" into an individual retirement account. (Letter from Linda S. Sepp, Dir. of Human Res., Horizon, to Jerome Maher (Apr. 4, 1984), AR 57.)

On September 28, 1984, Horizon's plan administrator Dominic Cannon wrote to the PBGC certifying that "[e]ach participant elected in writing the alternative form of distribution"—*i.e.*, a lump-sum payment. (Plan Admin.'s Certification for an Alternative Form of Distribution, AR 59). *See* 29 C.F.R. § 4044.73(a)(1) (characterizing a "lump sum" payment as an "alternative form of distribution").[5] Then, on January 16, 1985, Cannon again wrote to the PBGC, this time "certify[ing] that the Plan's assets were allocated in accordance with" ERISA, and attaching a list of benefit distributions to individual beneficiaries, including a lump-sum benefit of $57,834 to Maher. (Letter from Dominic Cannon, Vice Chairman and Trustee of the Plan, Horizon, to Andrew Murphy, Case Officer, PBGC (Jan. 16, 1985) ("Certificate of Distribution"), AR 17; *see also id.* 19.) The benefit distribution list clarified that Maher received a "benefit" of $57,834 at a "cost" to Horizon of $58,754.59. (*See* Certificate of Distribution, AR 19.)[6]

---

[5] In 1984, PBGC regulations required that a plan administrator submit such a certification to the agency before distributing benefits in any form other than an annuity. *See* 29 C.F.R. § 2619.26(a) (1984) ("A benefit that is payable as an annuity under the provisions of a plan need not be provided in annuity form if . . . [t]he plan provides for an alternative form of distribution, and the plan administrator submits a statement to the PBGC in which he or she certifies that[,]" *inter alia*, "the participant elected, in writing, the alternative form of distribution[.]").

[6] This difference likely reflected a change in distribution dates: Horizon had calculated benefit amounts assuming that interest would be credited to each individual's lump-sum benefit at a rate of 7% from the proposed termination date of June 1, 1984, through the proposed distribution date of September 1, 1984. (*See* Form 6088, AR 16.) But in its letter to PBGC certifying the distribution of benefits, Horizon explained that, at PBGC's suggestion, it ultimately distributed benefits on November 28, 1984, not September 1, which would have allowed for more interest to accumulate. (*See* Certificate of Distribution, AR 17.)

5

C.  **Procedural History**

Beginning on March 14, 2012—more than 27 years after the termination of the First Federal pension plan and the purported distribution of its funds to the plan's beneficiaries—and continuing until May 24, 2013, Maher wrote a series of letters to the PBGC, claiming that he was never paid the $57,834 to which he was entitled under the First Federal pension plan and requesting that the PBGC pay him the guaranteed portion of that amount.  (*See, e.g.*, Letter from Jerome A. Maher to Mark Fifer, PBGC (Jan. 16, 2013), AR 53 ("I never received a lump sum benefit or any other benefit from the First Federal Savings and Loan Association of Wilmette Retirement Plan.").)  The PBGC sent a letter to Maher on October 25, 2013, informing him of its "determin[ation] that there is no basis to support [his] allegations that [he is] owed an unpaid benefit from the Plan."  (Letter from Charles Korb, Manager, Processing and Technical Assistance Branch, PBGC, to Jerome A. Maher (Oct. 25, 2013), AR 63.)  In reaching this decision, the PBGC relied on Horizon's letter to the PBGC (dated January 16, 1985), which certified that all beneficiaries of the First Federal plan, including Maher, had received the benefits to which they were entitled.  (*See id.* (observing that "one of the Plan's trustees, Dominic P. Cannon, certified that a lump sum benefit of $57,834 was distributed to you").)  The PBGC decision further noted that Maher's own assertion that he was never paid "provides no credible basis to determine that [he] did not receive a benefit from the Plan[,]" because "it is based on [his] recollection alone of events of almost 30 years ago[,]" and because it is unreasonable to infer that Maher was not paid given "the extensive role [he] played in the Plan's termination and distribution of benefits, as an Executive Vice President" of Horizon.  (*Id.*)

6

Maher appealed the PBGC's denial of his request for benefits to the PBGC Appeals Board in two separate letters dated three days apart in November of 2013. (*See* Letter from Jerome A. Maher to PBGC Appeals Board (Nov. 11, 2013) ("Nov. 11 Appeal Letter"), AR 88–89; Letter from Jerome A. Maher to PBGC Appeals Board (Nov. 14, 2013) ("Nov. 14 Appeal Letter"), AR 55–56.) Maher's appeal re-emphasized that he never received a lump-sum benefit in connection with the termination of the First Federal plan in 1984. (*See* Nov. 14 Appeal Letter, AR 56.) Maher also contended that the PBGC's initial denial decision was wrong both to doubt his recollection (*see* Nov. 11 Appeal Letter, AR 88 ("I think I would remember if I received an additional $57,834 in 1984")), and to infer that he must have been paid from the fact that he personally played a significant role in the plan's termination (*see id.*, AR 89 (stating that "my only role in the termination of the Pension Plan" was to "sign[] a power of attorney" to Horizon's accountants "to provide the actuarial report to satisfy the [PBGC] that the Plan had sufficient assets to fund the pension obligations")). Finally, Maher argued that the September 28, 1984, and January 16, 1985, certification letters from Cannon to the PBGC are dubious on their face because they state that, with two exceptions, all participants in the First Federal plan (including Maher) elected to receive immediate lump-sum payments rather than annuities upon retirement. (*See* Nov. 11 Appeal Letter, AR 89; Nov. 14 Appeal Letter, AR 56.) Maher contended that it would have been unreasonable for each plan participant to have elected a lump-sum distribution "due to the adverse tax consequences of such a decision[,]" and stated that he "d[id] not recall doing" so. (Nov. 14 Appeal Letter, AR 56.)

7

The PBGC Appeals Board denied Maher's appeal in a written opinion on March 25, 2015. (*See* Letter from William D. Ellis, Appeals Board Member, PBGC, to Jerome Maher (Mar. 25, 2015) ("PBGC Appeal Decision"), AR 2–9.) The Board noted that Maher's appeal "hinge[d] on a factual question, namely whether [he] already received in 1984 the lump-sum value of [his] Plan benefit." (*Id.*, AR 5.) In considering that question, the Board relied primarily on Cannon's January 16, 1985, certification letter to the PBGC, which, in the Board's view, "show[ed that Maher] received [his] benefit in a lump sum." (*Id.*, AR 6; *see also id.*, AR 8.) The Board also discounted Maher's tax-consequences reasoning, because as Horizon's April 4, 1984, letter to Maher explained, any beneficiary who selected a lump-sum payment would have been eligible for "a non-taxable rollover into another deferred-tax retirement plan[.]" (*Id.*, AR 6.) The Board also reaffirmed the logic of the initial PBGC denial decision—*i.e.*, that given Maher's senior position at Horizon and direct involvement in the termination of the First Federal pension plan, he would have been in a position to know about and to correct any error in the distribution of his benefits. (*See id.*, AR 7.) And the Board reasoned further that Maher's failure to take any corrective action in 1984 at the time of the plan's termination—or even in 1999, when he should have started receiving annuity payments under his theory that he never selected a lump-sum distribution—discredits his contention that he did not receive the benefits to which he was entitled. (*See id.*) Ultimately, the Board concluded that "[t]he evidence shows [that Maher] received [his] Plan benefit in a lump sum in 1984." (*Id.*, AR 8.)

Maher filed the complaint in the instant lawsuit on August 27, 2015, challenging the PBGC Appeals Board's decision. (*See* Compl., ECF No. 1.) *See also* 29 U.S.C.

§ 1303(f) (providing that adverse decisions of the PBGC may be challenged in federal district court).[7] The parties have filed cross-motions for summary judgment (*see* Def.'s Mem.; Pl.'s Mem.), which are now ripe for the Court's review (*see* Def.'s Opp'n to Pl.'s Cross-Mot. for Summ. J. & Reply to Pl.'s Opp'n to PBGC's Mot. for Summ. J. ("Def.'s Reply"), ECF No. 32; Pl.'s Reply to Def.'s Opp'n to Pl.'s Mot. for Summ. J. ("Pl.'s Reply"), ECF No. 35). In its motion, the PBGC asserts that each element of the Appeals Board's opinion was reasonable, and that the Board's ultimate "rejection of Plaintiff's claim that he never received his Plan benefit is based on a complete and reasonable consideration of the evidence." (Def.'s Mem. at 10.) In his motion, Maher chiefly contends that the Appeals Board based its conclusion that he already received his benefits on a misinterpretation of the letter Horizon sent to the PBGC on January 16, 1985. (*See* Pl.'s Mem. at 3–4.)

## II. LEGAL STANDARD

When evaluating a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, a district court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In lawsuits challenging agency action under the APA, a district court acts as an appellate tribunal and evaluates whether the agency action under review complies with the law and is supported by the record. *See Remper v. Sharfstein*, 583 F.3d 860, 865 (D.C. Cir. 2009). Because this exercise typically involves evaluation of a pure question of law, *see id.*, a district court

---

[7] Maher initially brought this lawsuit in the U.S. District Court for the Northern District of Illinois (*see* Compl. at 1), but that court determined that venue was improper and transferred the case to the U.S. District Court for the District of Columbia (*see* Mem. Op. & Order, ECF No. 17).

9

presented with cross-motions for summary judgment in an APA case generally does not focus on whether there is a "genuine dispute as to any material fact[,]" but rather on whether "the movant is entitled to judgment as a matter of law" under the applicable APA standard of review. Fed. R. Civ. P. 56(a); *see, e.g.*, *New England Anti-Vivisection Soc'y v. U.S. Fish & Wildlife Serv.*, 208 F. Supp. 3d 142, 154 (D.D.C. 2016); *Ass'n of Private Sector Colleges & Univs. v. Duncan*, 110 F. Supp. 3d 176, 184 (D.D.C. 2015).

As relevant here, under the APA, a district court must set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A); *see also LTV Corp.*, 496 U.S. at 654–56 (reviewing an informal adjudication of the PBGC under the APA's arbitrary-or-capricious standard). "Under that standard, [courts] will uphold agency findings that are supported by substantial evidence, even if [the court] might have reached a different conclusion in the first instance." *Epsilon Electronics, Inc. v. U.S. Dep't of the Treasury*, 857 F.3d 913, 918 (D.C. Cir. 2017); *see also Safe Extensions, Inc. v. FAA*, 509 F.3d 593, 604 (D.C. Cir. 2007) (explaining that even an agency's decision in the context of an informal adjudication must be supported by substantial evidence). "The APA's substantial evidence standard requires more than a scintilla, but can be satisfied by something less than a preponderance of the evidence." *Epsilon Electronics*, 857 F.3d at 925 (internal quotation marks and citation omitted). An agency's factual finding is supported by substantial evidence if "there is such relevant evidence as a reasonable mind might accept as adequate to support the [agency's] conclusion." *Mach Mining, LLC v. Sec'y of Labor*, 809 F.3d 1259, 1263 (D.C. Cir. 2016) (internal quotation marks and citation omitted).

## III. DISCUSSION

Substantial evidence in the record supports the PBGC's factual finding that Maher received the benefits to which he was entitled in 1984, when the First Federal plan was terminated. In making its finding, the PBGC Appeals Board relied in large part on a letter that Dominic Cannon (the administrator of the First Federal pension plan) sent to the PBGC on January 16, 1985, notifying the PBGC that the benefits were distributed. (*See* PBGC Appeal Decision, AR 3, 6, 8.) That reliance was entirely reasonable, because the letter expressly "certif[ied] that the Plan's assets were allocated in accordance with" ERISA (Certificate of Distribution, AR 17), and it specifically and unequivocally listed Maher's "lump sum" benefit of $57,834 in an attached schedule of benefit distributions (*id.*, AR 19). There is no question that this certification letter, standing alone, is "relevant evidence" that "a reasonable mind might accept as adequate to support the [PBGC's] conclusion." *Mach Mining*, 809 F.3d at 1263 (internal quotation marks and citation omitted). And when one adds to this the fact that Maher—a Horizon executive who had at least certain responsibilities vis-à-vis the retirement plan and who unquestionably knew about the scheduled plan termination and distribution of benefits in the mid-1980s—waited more than 27 years to take any steps to recover the $57,834 amount that was still allegedly owed to him, it is clear to this Court that the PBGC's findings and its denial of Maher's appeal were well-supported.

Maher's chief argument to the contrary is that Horizon's certification letter of January 16, 1985, was actually a schedule of plan benefit liabilities *yet to be paid*, and not a certification of benefit distributions that Horizon had already made. (*See* Pl.'s Mem. at 3–4.) But that argument misreads the administrative record in two key respects. First, Maher contends that the letter could not be a certification of benefits

already paid because it "was written January 15, 1984, six months *before* the Pension Plan received permission to terminate the Plan." (*Id.* at 3 (emphasis added).) In this regard, Maher simply gets the date wrong: the letter was actually written on January 16, 1985—*after* the Plan's distribution date of November 28, 1984. (*See* Certificate of Distribution, AR 17.) Second, Maher contends that the list of benefit amounts attached to the letter appeared on IRS Form 6088, which is a form that ERISA plan administrators must submit to the PBGC when initiating the plan termination process in order to facilitate the PBGC's review of the sufficiency of the plan's assets, and which does not serve as a certification of distributions already made. (*See* Pl.'s Mem. at 3–4.) But again, Maher's factual premise is simply incorrect: the schedule of benefit payments that Cannon attached to his letter to the PBGC was *not* on IRS Form 6088; rather, it was a bare, untitled spreadsheet listing each beneficiary's name, address, telephone number, sex, date of birth, social security number, benefit amount, the cost to Horizon of providing that benefit, and the form in which the benefit was provided. (*See* Certificate of Distribution, AR 19.)[8]

What is more, the spreadsheet that was attached to the January 16, 1985, letter is entirely consistent with a 'certification' that benefits had already been distributed, because it lists exactly the information that a plan administrator was required to submit to the PBGC "*after* the plan administrator has completed the distribution of assets" under the regulations in place at that time. 29 C.F.R. § 2617.23(a) (1984) (emphasis

---

[8] Maher is correct that IRS Form 6088 appears in the administrative record, but that is because Horizon submitted Form 6088 as an attachment to its May 15, 1984, notice to the PBGC that Horizon intended to terminate the First Federal pension plan in the ensuing months (*see* Form 6088, AR 15)—a notice that Maher himself signed (*see* Form 5310, AR 10). Horizon did not include Form 6088 with its January 16, 1985, letter to the PBGC. (*See* Certificate of Distribution, AR 17–19.)

12

added); *see also id.* (requiring, "[f]or each participant or beneficiary to whom distribution was made[,]" a "[n]ame;" "[a]ddress;" "[t]elephone number;" "[s]ex;" "[d]ate of birth;" "[s]ocial security number;" "[t]he amount of the benefit provided[;]" "[t]he cost of providing the benefit;" and "[t]he form in which the benefit was provided"). And even more fundamentally, Maher's argument ignores the basic fact that the letter to which the spreadsheet was attached expressly stated that "[t]his letter is to certify that the Plan's assets *were allocated* in accordance with" ERISA. (Certificate of Distribution, AR 17 (emphasis added).)

Thus, this Court finds that the certification letter itself provides ample support for the PBGC Appeals Board's conclusion that Maher received the benefits to which he was entitled, and it agrees with the Board that Maher's failure to take any prior corrective action further demonstrates that there is no factual basis for his current claim.

## IV. CONCLUSION

The PBGC denied Maher's claim for benefits under a pension plan that was terminated in 1984 because it found, as a matter of fact, that Maher already received the benefits to which he was entitled under that plan. That factual finding was supported by substantial evidence in the administrative record, and therefore the PBGC's decision cannot be set aside as arbitrary or capricious under the APA. *See* 5 U.S.C. § 706(2)(A). Consequently, as set forth in the separate Order that accompanies this Memorandum

Opinion, the PBGC's motion for summary judgment is **GRANTED** and Maher's cross-motion for summary judgment is **DENIED**.


DATE:  September 26, 2017                     *Ketanji Brown Jackson*
                                              KETANJI BROWN JACKSON
                                              United States District Judge